UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SHAWN WOODWARD, 00-A-6563,

        Plaintiff,

        -vs-

CORRECTIONAL OFFICER MANN, et. al.,

        Defendants.
_____

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**Docket No. 09-CV-0451**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of Civil Procedure for the United States District Court for the Western District of New York, defendants submit this statement of undisputed material facts in support of their motion for summary judgment. The only facts material to this motion are not in dispute, and are as follows:

1. At the time of the events alleged in the Third Amended Complaint (Doc. No. 38; hereinafter "Complaint" or "Compl."), plaintiff was an inmate in the care and custody of the New York State Department of Correctional and Community Services ("DOCCS") and housed at Wende Correctional Facility. Compl. pg. 1[1]

2. At the time of the events alleged in the Complaint, Steven Fallon was a Lieutenant employed by DOCCS at Wende (See ¶ 1 of the declaration of Steven Fallon, submitted herewith).

3. At the time of the events alleged in the Complaint, Timothy Lewalski was a Sergeant employed by DOCCS at Wende (See ¶ 1 of the declaration of Timothy Lewalski, submitted herewith).

4. At the time of the events alleged in the Complaint, Dennis Camp was a Corrections

---

[1] The plaintiff has failed to state his claim in numbered paragraphs pursuant to FRCP 10 (b), so reference can only be made to pages.

       Officer employed by DOCCS at Wende. (See ¶ 1 of the declaration of Dennis Camp, submitted herewith).

5.     At the time of the events alleged in the Complaint, Michael Hojsan was a Corrections Officer employed by DOCCS at Wende. (See ¶ 1 of the declaration of Michael Hojsan, submitted herewith).

6.     At the time of the events alleged in the Third Amended Complaint, M. Mann was a Corrections Officer employed by DOCCS at Wende. (See ¶ 1 of the declaration of M. Mann, submitted herewith).

7.     At the time of the events alleged in the Complaint, Quenten Scissum was a Corrections Officer employed by DOCCS at Wende. (See ¶ 1 of the declaration of Quenton Scissum, submitted herewith).

8.     Plaintiff arrived at Wende on November 3, 2008 (See pgs. 9 - 10 of the deposition of the plaintiff, Shawn Woodward, taken on October 22, 2012, attached to the declaration of George Michael Zimmermann, submitted herewith; see also Doc. No. 49-1 Bates No. 0003).

9.     When first arriving at Wende, the plaintiff was housed in D Block. Woodward dep. 10.

10.     He was then moved to B block, 7 company, cell 1. Woodward dep. 10 - 11.

11.     Plaintiff believes he was moved off of D block because the inmates on D block tend to be in a particular program in which he did not participate. Woodward dep. at 11 - 12.

12.     He assumes that "movement and control" made the decision to move him from D block to B block. Woodward dep. at 12.

13.     As of December 15, 2008, the plaintiff was still housed on B block, 7 company, cell 1. Woodward dep. 10.

14. Prior to December 15, 2008, the plaintiff filed three grievances. Zimmermann dec. Ex. B, Bates Nos. 0128 - 0166.

15. The first grievance, denominated WDE-29986-08, was written on November 25, 2008, and concerned lack of heat on D block, which was then the plaintiff's housing block. Woodward dep. at 15 - 18, and 23; and Zimmermann dec. Ex. B, Bates Nos. 0128 - 0129.

16. The second grievance, denominated WDE-29972-08, was written on December 1, 2008, and concerned issues that occurred a Elmira Correctional Facility. Woodward dep. at 18 - 21; and Zimmermann dec. Ex. B, Bates Nos. 0134 - 0135.

17. The third grievance filed by plaintiff prior to December 15, 2008, was denominated WDE-29992-08, was written on December 8, 2008, and alleged that an Officer Burns was not allowing the plaintiff to attend breakfast or religious services. Woodward dep. at 12 - 17; and Zimmermann dec. Ex. B, Bates Nos. 0128.

18. None of the defendants in this action are mentioned in WDE-29986-08, WDE-29972-08, or WDE-29992-08. Zimmermann dec. Ex. B, Bates Nos. 0128 - 0129, 0134 - 0135, and 0165 - 0166.

19. On December 15, 2008, plaintiff states that defendant CO Mann informed him that he was moving to another cell. Woodward dep. at 21 and 26.

20. CO Mann was a regular officer on plaintiff's housing unit on B block. Woodward dep. at 21 - 22.

21. CO Mann was not involved in denying the plaintiff food or religious services, nor with the heating problem on B block. Woodward dep. at 22 - 23.

22. On December 15, 2008, the plaintiff was moved to 8 company. Woodward dep. at 24.

23. The plaintiff went to 8 company unescorted. Woodward dep. at 26 - 27.

24. The plaintiff states that his new cell was roach infested. Woodward dep. at 28.

25. The plaintiff complained about the conditions of the cell to the company officer. Woodward dep. at 29.

26. The company officer that plaintiff complained to is not a defendant in this law suit. Woodward dep. at 30.

27. Plaintiff alleges that CO Mann placed him in a roach infested cell to retaliate against him for filing two grievances regarding B-Block officers. Compl. pg. 1.

28. Inmates change housing cells every day at Wende, for a variety of reasons, including the need to house new inmates (See ¶ 9 of the declaration of Deputy Superintendant for Security Thomas Sticht, submitted herewith).

29. Many of the housing units in Wende are designated for particular programs, which are called "community based programs". Sticht dec. ¶ 10.

30. There are also housing units for other types on inmates, as well as housing units used primarily by deaf and blind inmates. Sticht dec. ¶¶ 11 - 12.

31. Changes in inmate cell assignments take into account many factors, including sensorial disability, health status, programs and discipline. Sticht dec. ¶¶ 9 - 12.

32. Further, a change in one inmates cell location can set off a chain reaction requiring other inmates to be moved as well. Sticht dec. ¶ 9.

33. Correctional Officers cannot transfer inmates from one housing cell to another without authorization from a Captain or Watch Commander. Mann dec. ¶ 4; and Sticht dec. ¶¶ 7 and 13.

34. Corrections Officers can not determine what cell an inmate will be placed in, when an inmate is moved. Sticht dec. ¶¶ 7, 8 and 13.

35. CO Mann could not have initiated the change on plaintiff's cell. <u>Sticht dec.</u> ¶¶ 7, 8 and 13.

36. CO Mann did not initiate the change on plaintiff's cell. <u>Mann dec.</u> ¶ 5.

37. CO Mann could not have determined what cell the plaintiff would be moved to. <u>Sticht dec.</u> ¶¶ 7, 8 and 13.

38. Plaintiff alleges that on December 27, 2008, he and CO Mann had another encounter, in the lobby of B block. <u>Woodward dep.</u> at 31 - 33.

39. Plaintiff asserts that CO Mann approached the plaintiff and ordered him to place his hands on the wall for a pat frisk. <u>Woodward dep.</u> at 35.

40. Plaintiff states that CO Mann punched him the ribs, instead of performing the pat frisk, and said "the next time I file a grievance on him or B-block. . . there will be more." <u>Woodward dep.</u> at 35 - 37.

41. Plaintiff states that he was sore for two hours, but never sought medical treatment for this soreness. <u>Woodward dep.</u> at 37 - 38.

42. CO Mann does not recall stopping the plaintiff on that date. <u>Mann dec.</u> ¶ 6.

43. CO Mann denies using any force against plaintiff. <u>Mann dec.</u> ¶¶ 6, and 9 - 10.

44. Had CO Mann used force on the plaintiff, he would have reported the incident. <u>Mann dec.</u> ¶ 7.

45. CO Mann did not complete a Use of Force report that day. <u>Mann dec.</u> ¶ 7.

46. Plaintiff filed a grievance that same day saying that CO Mann struck him. <u>Woodward dep.</u> at 38 - 40; and <u>Zimmermann dec.</u> Ex. B, Bates 0196 - 0197.

47. Prior to plaintiff writing this grievance, CO Mann had no knowledge that plaintiff had filed grievances or any knowledge of the subject of those grievances. <u>Mann dec.</u> ¶ 8 and Ex. A.

48. On January 1, 2009, plaintiff was working the evening program in the mess hall. Woodward Declaration, at 41 - 42.

49. On January 1, 2009, Sgt. Lewalski was working the 2 p.m. to 10 p.m. shift. Lewalski dec. ¶ 5.

50. Sgt. Lewalski signed in at 1:50 p.m. on January 1. Fallon dec. Ex. D, Bates No. 884; and Lewalski dec. ¶ 6.

51. Sgt. Lewalski duties included supervising the mess hall. Lewalski dec. ¶ 5.

52. At approximately 6 p.m. on January 1, CO Nigro informed Sgt. Lewalski that he had obtained information that the plaintiff might be carrying a weapon. Lewalski dec. ¶ 7.

53. CO Nigro had been working in the mess hall for a longtime, and Sgt. Lewalski had no reason to doubt him. Lewalski dec. ¶ 8.

54. Sgt. Lewalski instructed CO Nigro to remove plaintiff from the mess hall and perform a pat frisk on him. Lewalski dec. ¶ 7.

55. Sgt. Lewalski wanted the plaintiff out of the mess hall to remove any complications if the plaintiff did have a weapon. Lewalski dec. ¶ 7.

56. At approximately 6 p.m. on January 1, an officer told plaintiff to leave the mess hall to go into the hallway. Woodward dep. at 42 - 43.

57. Plaintiff was escorted from the mess hall into the hallway because CO Nigro was given information that the plaintiff was carrying a weapon. Lewalski dec. ¶ 7.

58. The plaintiff can not identify by name the officer who instructed him to leave the mess hall. Woodward dep. at 43 and 80.

59. In the hallway, the plaintiff states that he was met by two more officers. Woodward dep. at 44.

60. Plaintiff can not identify those officer, either. Woodward dep. at 45 and 80.

61. All three officers were familiar to the plaintiff, as they were regularly assigned to the mess hall area. Woodward dep. at 45 - 46.

62. Once out of the mess hall, the plaintiff was pat frisked by one of the three officers. Woodward dep. at 49; and Lewalski dec. ¶ 9.

63. The officer performing the frisk was CO Nigro. Lewalski dec. ¶ 9.

64. Also present was CO Reinig. Lewalski dec. ¶ 9.

65. Sgt. Lewalski states that he was present for the frisk. Lewalski dec. ¶ 9.

66. The plaintiff states that Sgt. Lewalski appeared after the frisk was complete. Woodward dep. at 51.

67. Plaintiff states that Sgt. Lewalski whispered in one of the officers' ear, but the plaintiff could not hear what he said. Woodward dep. at 52.

68. Plaintiff states that Sgt. Lewalski then grabbed him around the neck by, and threatened the plaintiff with a beating and time "in the box" if he told anyone, and then struck the plaintiff in the back of the head. Woodward dep. at 52 - 55.

69. Sgt. Lewalski denies that he or any officer threaten, used force against, or touched the plaintiff. Lewalski dec. ¶ 13.

70. If force was used on the plaintiff, a Use of Force Report would have to have been completed. Lewalski dec. ¶ 17.

71. No Use of Force Report was completed. Lewalski dec. ¶ 17.

72. No weapon or contraband was found on plaintiff. Lewalski dec. ¶ 9.

73. Sgt. Lewalski ordered that plaintiff to be returned to his cell and placed on keeplock while Lewalski investigated the matter. Woodward dep. at 55; and Lewalski dec. ¶ 9.

74. Plaintiff never sought medical treatment as a result of being choked and punched by Sgt. Lewalski. Woodward dep. at 79 - 80.

75. Plaintiff does not feel he was injured as a result of being choked and punched by Sgt. Lewalski. Woodward dep. at 80.

76. Inmates on keeplock are kept in their cell, not allowed to go to programs, and fed in his cell, but are allowed one hour of recreation outside of their cells. Woodward dep. at 59 - 60; Fallon dec. ¶ 10; and Lewalski dec. ¶ 10.

77. Sgt. Lewalski placed the plaintiff in keeplock so that he could investigate the allegation that plaintiff possessed a weapon. Lewalski dec. ¶¶ 9, 11 and 20.

78. An inmate in possession of a weapon is a threat to staff and other inmates. Fallon dec. ¶ 12; and Lewalski dec. ¶ 11.

79. The mess hall log book for January 1, 2009, indicates that the plaintiff was sent back to his cell at 6:05 p.m. to be keeplocked pending investigation. Fallon dec. ¶ 22, and Ex. D Bates No. 0230.

80. The log book for B block indicates that at 6:25 p.m., the plaintiff returned to his cell, and was to be keeplocked "per Nigro". Fallon dec. ¶ 22 and Ex. D, Bates No. 0025.

81. Prior to January 1, 2009, the plaintiff never had any negative dealings with Sgt. Lewalski and had never filed a grievance against him. Woodward dep. at 56 - 57.

82. Sgt. Lewalski does not recall speaking to or knowing plaintiff prior to January 1, 2009. Lewalski dec. ¶ 4.

83. Prior to January 1, 2009, Sgt. Lewalski had no knowledge of plaintiff's grievance or litigation history. Lewalski dec. ¶¶ 4, 19, and 21.

84. Plaintiff has no documentary proof that the three officers who directed him out of the mess

hall and frisked him did so in retaliation for his protected activity. <u>Woodward dep.</u> at 61.

85. Plaintiff feels that the three officers who directed him out of the mess hall and frisked him did so in retaliation for his protected activity based on "[b]eing in prison for a certain amount of years and pick[ing] up these things". <u>Woodward dep.</u> at 61.

86. Plaintiff has no documentary proof that Sgt. Lewalski's motivation in striking him and having him keeplocked was to retaliate against plaintiff for his protected activity. <u>Woodward dep.</u> at 61 - 62.

87. Plaintiff feels that Sgt. Lewalski's actions were retaliatory based on the timing of his grievance against CO Mann and his perception that he did nothing to be keeplocked for. <u>Woodward dep.</u> at 62.

88. The Complaint lists CO Camp, CO Hojsan, and CO Scissum as the officers in the hallway during the pat frisk on January 1, 2009. <u>Compl.</u> pg. 2 - 3.

89. CO Camp was not present at the time of these allegations, as it was his day off. <u>Camp dec</u> ¶ 4.

90. Neither CO Hojsan nor CO Scissum were in the facility at the time alleged by plaintiff, as they worked the mess hall on the 5 a.m. to 1 p.m. shift. <u>Hojsan dec.</u> ¶ 4 - 5; <u>Scissum dec.</u> ¶ 4 - 5 (See also ¶ 7 and Exhibit A of the declaration of Joyce Krygier, submitted herewith).

91. Lt. Steven Fallon had no role in the plaintiff being keeplocked on January 1, 2009. <u>Fallon dec.</u> ¶ 27.

92. On January 1, 2009, the plaintiff wrote out a grievance regarding the events at the mess hall on January 1, 2009. <u>Woodward dep.</u> at 62 - 64; and <u>Zimmermann dec.</u> Ex. B, Bates Nos. 0181 - 0182.

93. This grievance was denominated WDE-30047-09. <u>Woodward dep.</u> at 63; and

9

Zimmermann dec. Ex. B, Bates Nos. 00181; See also Exhibit A of the declaration of Debra Fuller, submitted herewith.

94. In that grievance, the plaintiff states that at "approximately 6:34 p.m." a Sgt. Naino grabbed him and chocked him and threatened him with a "'beatdown'". Zimmermann dec. Ex. B, Bates Nos. 00181.

95. In the same grievance, he identifies a "CO Nygel" as having been one of the Officers who witnessed this. Zimmermann dec. Ex. B, Bates Nos. 00181.

96. Sgt. Lewalski released the plaintiff from keeplock on the evening of January 4, 2009. Lewalski dec. ¶ 12.

97. Grievance WDE-30047-09 was received by the Inmate Grievance Review Committee ("IGRC") on January 5. Fuller dec. ¶ 8.

98. In the late morning of January 6, 2009, the plaintiff was moved from his cell in B block to C block, 14 company, cell 15. Woodward dep. at 66; and Fallon dec. ¶ 23, and Ex. D Bates Nos. 0026 and 0027.

99. Neither of the log book entries for B block or C block for January 6, indicate that the plaintiff was on keeplock. Fallon dec. ¶ 23, and Ex. D Bates Nos. 0026 and 0027.

100. Under normal circumstances, if the plaintiff had been under keeplock on January 6, that would have been noted in both log book entries. Fallon dec. ¶ 23; and Lewalski dec. ¶ 16.

101. On January 7, 2009, the Muslim Chaplin A. Aleem Hassan authored a memorandum to a Capt. Kearney detailing a possible threat to plaintiff's safety. Zimmermann dec. Ex. C.

102. On January 8, 2009, the C block log book contains an entry note timed 3:35 p.m., indicating that "As per Capt. Kearney, inmate Woodward 14-15 does not get to go to any programs until further notice" (emphasis in original). Fallon dec. ¶ 24 and Ex. D Bates No.

0028.

103. On January 10, 2009, at 6:10 p.m., Lt. Fallon came to interview the plaintiff in his cell, regarding grievance WDE-30047-09. <u>Woodward dep.</u> at 65 - 66; and <u>Fallon dec.</u> ¶¶ 5 and 8.

104. He did so at the direction of Capt. Casaceli. <u>Fallon dec.</u> ¶ 7; and <u>Fuller dec.</u> ¶ 10.

105. Lt. Fallon entered C block at 6:10 p.m., on January 10. <u>Fallon dec.</u> ¶ 25 and Ex. D Bates No. 0229.

106. The plaintiff had never interacted with Lt. Fallon before this date. <u>Woodward dep.</u> at 70 - 71; and <u>Fallon dec.</u> ¶ 4.

107. Prior to January 10, 2009, Lt. Fallon did not recall ever seeing or speaking to the plaintiff. <u>Fallon dec.</u> ¶ 4.

108. Prior to January 10, 2009, Lt. Fallon had no knowledge of plaintiff's history of grievances or law suits. <u>Fallon dec.</u> ¶ 4.

109. The plaintiff was interviewed in his cell, which was cell 15, 14 company, in C block. <u>Fallon dec.</u> ¶¶ 5 and 8.

110. The plaintiff would not leave his cell for the interview. <u>Fallon dec.</u> ¶ 8.

111. During this interview, the plaintiff informed Lt. Fallon that he had been on keeplock since January 1, and did not know why. <u>Woodward dep.</u> at 67; and <u>Fallon dec.</u> ¶ 9.

112. Lt. Fallon states that he asked the plaintiff if he was in protective custody and if he needed protective custody. <u>Fallon dec.</u> ¶ 9.

113. Plaintiff does not recall discussing protective custody with Lt. Fallon. <u>Woodward dep.</u> at 71.

114. Plaintiff denied that he needed protective custody. <u>Fallon dec.</u> ¶ 9.

115.  Lt. Fallon told plaintiff he would look into why he was keeplocked. Woodward dep. at 67.

116.  After speaking with the plaintiff, Lt. Fallon spoke to Sgt. Lewalski as part of his investigation into the plaintiff's grievance. Fallon dec. ¶ 11; and Lewalski dec. ¶ 18.

117.  Sgt. Lewalski told Lt. Fallon that on January 1, CO Nigor had information that the plaintiff may have been carrying a weapon. Fallon dec. ¶ 11.

118.  Sgt. Lewalski informed Lt. Fallon that the plaintiff was searched and no weapon was found. Fallon dec. ¶ 11.

119.  Sgt. Lewalski told Lt. Fallon that the plaintiff was then placed on keeplock for seventy-two hours, so the allegation could be investigated. Fallon dec. ¶ 11.

120.  Sgt. Lewalski informed Lt. Fallon that the plaintiff had been released from keeplock on the evening of January 4. Fallon dec. ¶ 11.

121.  Lt. Fallon believed the keeplocking of the plaintiff to be an appropriate response to CO Nigro's information. Fallon dec. ¶ 12.

122.  Lt. Fallon obtained written statements regarding the January 1, pat frisk in the mess hall from Sgt. Lewalski, CO Nigor and CO Reinig. Fallon dec. Ex. B, Bates Nos. 0184 to 0187; and Lewalski dec. ¶ 18.

123.  Lt. Fallon also spoke to Capt. Kearney as to why the plaintiff was still on keeplock. Fallon dec. ¶ 13.

124.  Capt. Kearney informed Lt. Fallon that plaintiff had been kept in his cell since January 5, 2009, due to possible threats against the plaintiff from members of the Muslim community. Fallon dec. ¶ 14.

125.  This information had come from the Muslim Imam. Fallon dec. ¶ 14; see also Zimmermann dec. Ex. C.

12

126. Kearney directed Lt. Fallon to complete an Involuntary Protective Custody ("IPC") Recommendation, which Lt. Fallon did. Fallon dec. ¶ 14.

127. Lt. Fallon also discussed the issue with Capt. Casaceli. Fallon dec. ¶ 16.

128. The logbook entry for C block indicates that at 7:15 p.m., on January 10, the plaintiff was transferred to 26 company, 6 cell. Fallon dec. ¶ 26, and Ex. D Bates No. 0884.

129. E Block is where IPC inmates are housed. Woodward dep. at 73 - 74; and Fallon dec. ¶ 26.

130. Plaintiff believes that he was transferred from C block to E block on January 12, 2009. Woodward dep. at 73.

131. Lt. Fallon filled out an IPC Recommendation at 8:30 p.m. on January 10. Fallon dec. ¶ 14 and Ex. A.

132. Lt. Fallon filled out the IPC Recommendation based on the information he received from Capt. Kearney. Fallon dec. ¶ 16.

133. Based on the information he had received, Lt. Fallon was required to issue the IPC Recommendation. Sticht dec. ¶¶ 18 - 19, and 23 - 24.

134. IPC is the functional equivalent of keeplock. Woodward dep. at 74.

135. Inmates in IPC and keeplock do not have programs. Woodward dep. at 78.

136. However, neither Protective Custody ("PC") nor IPC is disciplinary in nature. Sticht dec. ¶ 16.

137. IPC and PC are for the protection of the inmate and the safety and security of the facility. Sticht dec. ¶ 16.

138. If a supervisor has information that an inmate may be in danger, but the inmate does not accept PC, the supervisor must recommend IPC. Sticht dec. ¶¶ 18 - 19.

139. An IPC Recommendation entitles an inmate to a hearing on whether IPC is appropriate. Sticht dec. ¶ 20.

140. On January 12, 2008, plaintiff was served with the IPC Recommendation authored by Lt. Fallon on January 10, 2009. Woodward dep. at 67.

141. Plaintiff asserts that Lt. Fallon issued the IPC recommendation to retaliate against him. Woodward dep. at 72.

142. Plaintiff bases this belief on the timing of Lt. Fallon's interview with him just prior to the IPC recommendation being authored. Woodward dep. at 72 - 73.

143. Lt. Fallon issued the IPC recommendation based on the information he received from Capt. Kearney and to protect the plaintiff and the security and good order of the facility. Fallon dec. ¶ 28.

144. As part of his investigation of grievance WDE-30047-09, Lt. Fallon obtained statements from Sgt. Lewalski on January 13, as well as CO Nigro and CO Reinig, and then summarized his findings in a memorandum to Capt. Casaceli. Lewalski dec. ¶ 18; and Fallon dec. ¶ 17, and Ex. B.

145. On January 16, DSS Sticht commenced a hearing based on Lt. Fallon's IPC Recommendation. Woodward dep. at 74 - 75; and Sticht dec. ¶ 21 and Ex. A, Bates Nos. 0252 and 0273.

146. At that hearing plaintiff was told that Capt. Kearney and Lt. Fallon believed that the plaintiff was having trouble with the Muslim community at Wende. Woodward dep. at 75 - 76.

147. He was told that this information was passed on by Muslim Chaplain Hassan. Woodward dep. at 76.

148. Plaintiff denies having any problems with anyone in the Muslim community at Wende. Woodward dep. at 76.

149. At the end of the IPC hearing, DSS Sticht decided that the plaintiff was not in need of IPC status. Woodward dep. at 76 - 77; and Sticht dec. ¶ 22 and Ex. A Bates No. 0252 and 0278 - 0279.

150. The fact that DSS Sticht decided that the plaintiff was not in need of IPC status does not indicate that he felt that Lt. Fallon wrongly issued the IPC Recommendation. Sticht dec. ¶ 22.

151. Following the IPC hearing, the plaintiff was released to general population and transferred to A block. Woodward dep. at 77.

152. The plaintiff filed a grievance complaining of the actions of Lt. Fallon in investigating the prior grievance and placing the plaintiff on IPC status. Woodward dep. at 78 - 79; and Fallon dec. ¶ 18.

153. On January 20, Lt. Fallon provided Capt. Casaceli with a written statement regarding those issues. Fallon dec. ¶ 20, and Ex. C.

154. This law suit was commenced on May 11, 2009 (Doc. No. 1).

Dated: Buffalo, New York
November 21, 2012

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
Attorney for Defendant
BY:

/s/ *George Michael Zimmermann*
GEORGE MICHAEL ZIMMERMANN
Assistant Attorney General of Counsel
Main Place Tower, Suite 300A
350 Main Street
Buffalo, NY 14202

        (716) 853-8444
        George.Zimmermann@ag.ny.gov